SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Jamire D. Williams (A-4/5-22) (086598)**

**Argued February 28, 2023 -- Decided May 30, 2023**

**SABATINO, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

These appeals arise out of a police officer's traffic stop and ensuing search of a passing automobile based upon information from a random query performed on a mobile data terminal (MDT) that revealed the car's registered owner had a suspended driver's license.

Defendants Jamire Williams and Tyshon Kelly, two males, had borrowed the car from its female owner. When they passed Police Officer Jeffrey Kless, who had been parked on the side of the road, Kless ran an MDT query on the car. The results revealed a photo of and standard identifying information about the car's registered owner, and that the registered owner had a suspended license. Kless pulled behind the car and activated his lights; the car pulled over without incident.

Kless approached the passenger side of the vehicle on foot. It was not until he arrived at the passenger-side window that he concluded the driver was not the female owner. Kless nonetheless requested a driver's license, registration, and insurance. Believing that he might have smelled marijuana while standing there, despite a stuffy nose, Kless arranged with a backup officer, who had not smelled anything except air fresheners, to have a canine sniff the car.

Prior to the sniff, Kless asked defendants to exit the vehicle. Williams stated that the officers would need consent from the vehicle's owner to perform the sniff, but an officer on the scene responded, "We don't need consent." The dog uncovered the presence of marijuana. An on-the-spot search thereafter revealed a gun under the driver's seat. Kless patted down defendants and placed them under arrest. Throughout the car search and pat down, Williams repeatedly protested to the officers about the search, including their lack of consent from the car owner. His words of protest were audible on the bodycam recording.

Defendants moved to suppress the evidence found in the car. The trial court denied the motions. After being convicted for weapon possession by a jury, defendants appealed. They challenged the denial of their suppression motions and

1

asserted that the jury charge on gun possession was plainly erroneous.  In addition, Williams individually claimed he was deprived of a fair trial because the jury was made aware of his protests to the search at the scene.  The Appellate Division rejected defendants' arguments and affirmed their convictions and sentences.  The Court granted certification.  252 N.J. 39 (2022); 252 N.J. 59 (2022).

**HELD:**  An MDT query revealing that a vehicle's owner has a suspended New Jersey driver's license provides constitutionally valid reasonable suspicion authorizing the officer to stop the vehicle -- unless the officer pursuing the vehicle has a sufficient objective basis to believe that the driver does not resemble the owner.  If, upon stopping the vehicle, it becomes reasonably apparent to the officer that the driver does not look like the owner whose license is suspended, the officer must cease the vehicle's detention and communicate that the motorist is free to drive away without further delay.  Based on the specific facts presented here, the initial stop of the vehicle was valid because it was based on reasonable suspicion.  However, the detention of defendants and the borrowed car was unconstitutionally prolonged after the officer recognized the driver was not the car's owner.  The officer's admittedly uncertain ability to tell if he smelled marijuana was inadequate evidence of "plain smell" to justify a continuation of the stop and a search of the vehicle.

1.  In Delaware v. Prouse, the United States Supreme Court held that a detention of a motorist to check credentials is unreasonable, except in situations in which there is at least reasonable and articulable suspicion that (1) a motorist is unlicensed or the vehicle is unregistered, or (2) either the vehicle or its occupants are otherwise subject to seizure for violating the law.  440 U.S. 648, 663 (1979).  In Kansas v. Glover, the Supreme Court considered whether the Fourth Amendment allows a police officer to "initiat[e] an investigative traffic stop after running a vehicle's license plate and learning that the registered owner has a revoked driver's license."  140 S. Ct. 1183, 1186 (2020).  The Court upheld the stop challenged in that case, pointing out that the deputy, after conducting a random query, "knew that the registered owner of the truck had a revoked license."  Id. at 1188.  Based on that information, the deputy "drew the commonsense inference that Glover was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop."  Ibid.  The majority in Glover observed that "[t]he fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [the officer's] inference."  Ibid.  The Court found it significant that the Kansas "license-revocation scheme covers drivers who have already demonstrated a disregard for the law or are categorically unfit to drive."  Id. at 1188-89.  The majority, however, took care to "emphasize the narrow scope of [its] holding," noting that "the presence of additional facts might dispel reasonable suspicion."  Id. at 1191.  "For example, if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties,

2

then the totality of the circumstances would not raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Ibid. Here, the Court considers for the first time whether the analysis in Glover -- specifically involving driver's license revocation laws in Kansas -- supports a comparable approach in New Jersey in a setting involving a car owner's suspended driver's license. (pp. 21-29)

2. In State v. Donis, the Court confronted the question of whether "suspicionless access" of information returned from an officer's random query on an MDT violated the New Jersey Constitution. 157 N.J. 44, 48 (1998). The petitioners in Donis argued that the police should be allowed to conduct MDT queries only when they observe a driver commit a traffic law infraction. Id. at 54. The Court disagreed, holding that it "would render MDTs useless as efficient investigative tools." Id. at 56. The majority stated in Donis that "[i]f the . . . MDT informed the officer that the car's owner had an expired or revoked license, the officer would have adequate grounds to stop that vehicle." Id. at 56-57. Later in the opinion, the majority elaborated further, noting that "the officers also had determined through a 'match-up' that the drivers were the registered owners." Id. at 58. (pp. 29-33)

3. Unlike the Kansas motor vehicle laws at issue in Glover, New Jersey's regulatory scheme has not markedly distinguished between the severity of offenses that can produce driver's license suspensions as opposed to revocations. Like Kansas, New Jersey authorizes license suspensions for a variety of offenses and conduct that do not involve driver safety infractions. On the other end of the spectrum, New Jersey drivers may have their licenses suspended -- rather than revoked -- for driving infractions causing death or bodily injury, and other serious categories of driving-related offenses such as DWI. The sharp line in Kansas between revocation-eligible offenses and suspension-eligible offenses is blurred in New Jersey, and the Court therefore declines to rest its constitutional analysis on that basis. Subject to constitutional limitations delineated in the Court's opinion in this case, a police officer in New Jersey has an equivalent legal basis to stop a vehicle for a suspension-based reason as a revocation-based reason. (pp. 34-37)

4. Data supplied by the Attorney General corroborates to some extent what the Supreme Court majority in Glover described as the "commonsense" nature of an inference that the vehicle owner, despite having lost the privilege to drive, can be reasonably suspected to be the person behind the wheel, as does the rebuttable presumption that the owner of a vehicle was the operator of the vehicle codified in New Jersey's eluding statute, N.J.S.A. 2C:29-2(b). The constitutional requirement of "reasonable and articulable" suspicion to stop a vehicle, articulated in Prouse, remains the Fourth Amendment standard. As Prouse and its progeny forbid, an officer may not stop a car on a mere hunch that the driver may lack proper credentials. (pp. 37-39)

3

5. In the absence of information that reasonably indicates to a pursuing officer that the driver is not the vehicle's owner, the MDT data furnishes reasonable suspicion to authorize the stop. But there is a crucial limitation to that principle: once it becomes reasonably apparent to the officer that the observed driver does not resemble the owner -- either by the photo displayed on the MDT or the age, gender, or description of the owner reported on the license or other visible characteristics -- the pursuit or stop of that driver must cease. Furthermore, an officer making an MDT-based stop who is presented with sufficient objective reason to believe the driver is not the owner may not, without further additional constitutional justification, linger by the vehicle and continue the roadside detention, even to collect or review the driver's documentation. Rather, the stop must end. If, however, during the brief time in which the officer is lawfully at the side of the car providing the motorist with a brief explanation that the vehicle was inadvertently stopped and permission to leave, that officer observes in plain view a firearm, illegal narcotics, or other apparent contraband within the vehicle, the officer may pursue a further investigation. In that situation, the officer may detain the motorist for an additional reasonable period of time based on reasonable suspicion that another, separate crime is being or has been committed. Such further investigation may include a canine drug sniff, provided the sniff does not consume an unreasonable period of time. (pp. 39-41)

6. The Court is cognizant that it can be impractical or hazardous for an officer to determine whether a driver clearly does not resemble the photo or description of the vehicle owner. The stop may occur at night in a poorly lit area, or the age, gender, height, or weight of the driver may not be readily ascertainable. These are all practical impediments affecting the totality of circumstances, and the reasonableness of an officer's continued inference that the stopped motorist is indeed the vehicle owner. But there will be other situations in which the mismatch is patently and immediately obvious. In such instances of obvious mismatch, the constitutional grounds to continue the stop evaporate. Lastly, the Court encourages law enforcement officials to make reasonable efforts to attempt visual verification that the driver is the owner if -- and only if -- it is feasible and safe to do so. As a matter of federal and state constitutional law, the Court does not mandate visual confirmation. (pp. 41-43)

7. In the circumstances presented here, Officer Kless had a sufficient reasonable and articulable suspicion to stop the car. However, when Kless walked up to the car's passenger side and saw the two occupants from a close distance, it was apparent that Williams was not the car's registered owner. And Kless's subsequent uncertain perception of marijuana odor failed to rise to the level of reasonable and articulable suspicion of criminality to have authorized the continued detention. The facts here are simply too weak to support a plain-smell justification to prolong this mistaken stop and proceed with a search of the car once it was apparent that the owner was

4

not the driver.  Although the drug-sniffing dog arrived with another officer only a few minutes later and the search was performed quickly, defendants should have been already permitted to leave at that point.  Immediately upon observing the occupants of the vehicle, Kless should have done no more than explain the vehicle had been inadvertently stopped and told defendants they were free to leave.  Because the police lacked a reasonable and articulable suspicion to prolong the stop, the fruits of the ensuing car search were therefore unconstitutionally obtained and must be suppressed.  And because the judgments of conviction for gun possession were based on evidence of a seized weapon that should have been excluded at trial, the Court vacates defendants' convictions of those charges and remands for further proceedings.  (pp. 44-47)

8.  The Court discerns no plain error stemming from the use of the model jury charge on gun possession in this case.  The Court refers this subject to the Model Criminal Jury Charges Committee as specified in the Court's opinion.  (pp. 48-49)

9.  As to the video footage in which Williams questioned the police's right to conduct a canine sniff and search of the car without the owner's permission, the video should have been played without the audio.  However, the erroneous admission of that evidence was harmless in light of the proofs as a whole and the context of the trial.  It is unclear that a jury would necessarily regard Williams in a negative light for voicing the property interests of the absent car owner.  (p. 50)

**REVERSED and REMANDED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUDGE SABATINO's opinion.**

5

SUPREME COURT OF NEW JERSEY

A-4/5 September Term 2022

086598

State of New Jersey,

Plaintiff-Respondent,

v.

Jamire D. Williams,
a/k/a Jamere Williams,
and Jah Jah,

Defendant-Appellant.

State of New Jersey,

Plaintiff-Respondent,

v.

Tyshon Kelly, a/k/a
Tyshon Kelley,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| February 28, 2023 | May 30, 2023 |

Kevin S. Finckenauer, Assistant Deputy Public Defender,
argued the cause for appellant Jamire D. Williams

1

(Joseph E. Krakora, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Andrew I. Haddad, Designated Counsel, admitted pursuant to Rule 1:21-3(c), argued the cause for appellant Tyshon Kelly (Joseph E. Krakora, Public Defender, attorney; Alison Perrone, Deputy Public Defender, and Catherine J. Djang, Designated Counsel, admitted pursuant to Rule 1:21-3(c), on the briefs).

Melinda A. Harrigan, Assistant Prosecutor, argued the cause for respondent State of New Jersey (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Melinda A. Harrigan, of counsel and on the briefs, and Monica do Outeiro, Special Deputy Attorney General/Acting Assistant Prosecutor, on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Aidan P. O'Connor argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

Frank Muroski, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Frank Muroski, of counsel and on the brief).

JUDGE SABATINO (temporarily assigned) delivered the opinion of the Court.

These appeals arise out of a police officer's traffic stop and ensuing search of a passing automobile based upon information from a random query performed on a mobile data terminal (MDT) that revealed the car's registered owner had a suspended driver's license. Defendants, two males, had borrowed the car from its female owner. The police officer, who had been parked on the side of the road, was unable to tell whether its driver resembled the license photo and description of the suspended owner. It was not until the officer made the stop and arrived at the passenger-side window that he concluded the driver was not the female owner. The officer nonetheless requested a driver's license, registration, and insurance. Believing that he might have smelled marijuana while standing there, despite a stuffy nose, he arranged with a backup officer to have a canine sniff the car. The dog uncovered the presence of marijuana. An on-the-spot search thereafter revealed a gun under the driver's seat.

Defendants contend the stop of the car and its warrantless search violated the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, and that the fruits of the search must be suppressed. The trial court and the Appellate Division rejected those arguments and affirmed defendants' convictions.

3

In assessing these issues, we are largely guided by the United States Supreme Court's decision in Kansas v. Glover, 589 U.S. ___, 140 S. Ct. 1183 (2020). There, the Court ruled that the Fourth Amendment permits an MDT-based stop of a vehicle owned by a driver with a revoked driver's license if the officer lacked information negating an inference that the owner is the driver. We also consider our pre-Glover opinion in State v. Donis, 157 N.J. 44 (1998), in which we ruled that an officer's random check of a vehicle's license plate using an MDT and ensuing stop of that vehicle was consistent with the New Jersey Constitution, subject to certain limitations. In the intervening twenty-five years since Donis, MDT technology has rapidly advanced and now enables an officer to check hundreds of license plates almost instantaneously.

Applying the rationale of Glover to the present situation involving a suspended, rather than a revoked, New Jersey driver's license, we hold that an MDT query revealing such information provides constitutionally valid reasonable suspicion authorizing the officer to stop the vehicle -- unless the officer pursuing the vehicle has a sufficient objective basis to believe that the driver does not resemble the owner. If, upon stopping the vehicle, it becomes reasonably apparent to the officer that the driver does not look like the owner whose license is suspended, the officer must cease the vehicle's detention, and communicate that the motorist is free to drive away without further delay.

Based on the specific facts presented here, we uphold the initial stop of the vehicle because it was based on reasonable suspicion. However, we reverse the judgment of the Appellate Division and hold that the detention of defendants and the borrowed car was unconstitutionally prolonged after the officer recognized the driver was not the car's owner. That is because the officer's admittedly uncertain ability to tell if he smelled marijuana was inadequate evidence of "plain smell" to justify a continuation of the stop and a search of the vehicle.

For the sake of completeness, we also briefly address jury charge and evidentiary issues raised, but do not reverse defendants' convictions on those independent grounds.

I.

A.

While on routine traffic patrol at about 7:21 p.m. on December 21, 2016, Borough of Deal Police Officer Jeffrey Kless observed a Nissan being driven southbound into Deal from Long Branch. When the Nissan passed Kless, he performed a random query on his MDT[1] of its registration. The MDT query returned the vehicle's make, model, year, and vehicle identification number.

---

[1] An MDT "consists of a screen and keypad that are linked to the computerized databases of the New Jersey" Motor Vehicle Commission (MVC). Donis, 157 N.J. at 46. "Because the MDT is an inquiry-only device

5

According to Kless's testimony at the suppression hearing, typically, if there are any issues with the vehicle's registration or its registered owner's driver's license, the MDT program automatically returns a full query. That full query displays more information about the registered owner, including the person's name, address, date of birth, social security number, and other information contained on a driver's license. The display includes a photo of the registered owner as well as the owner's gender, as self-reported to the MVC as part of the driver's license application.[2]

---

and has no computing power of its own, a police officer is unable to add, change, or delete any information displayed on the pre-formatted screen. Information may be retrieved through the MDT by entering a license plate number." Ibid. The technology has improved over the years. MDTs can now be used in conjunction with Automated License Plate Recognition (ALPR) systems, which are capable of capturing license plate data without the need for a police officer to enter an individual plate number into the MDT. David J. Roberts & Meghann Casanova, Automated License Plate Recognition (ALPR) Use by Law Enforcement:  Policy and Operational Guide 9 (Aug. 2012) (ALPR Operational Guide), available at https://www.theiacp.org/sites/default/ files/IACP_ALPR_Policy_Operational_Guidance.pdf. According to law enforcement data, as of 2012, ALPRs could read up to 1,800 license plates per minute. Ibid. An appendix to that study reported that ALPRs used in New York can capture data for over 3,000 plates per minute. Id. at app. A (citing N.Y. State Dep't of Crim. Just. Servs., License Plate Reader Suggested Guidelines 11 (Jan. 2011)).

[2] Because random MDT queries are stored for only sixty days unless purposefully kept by law enforcement, there is no record of exactly how many such queries Kless performed during his shift. However, he estimated that he performed between ten and fifteen queries before observing the Nissan.

6

When Kless conducted the query about the Nissan, the MDT revealed that the registered owner had a suspended license. The MDT displayed the owner's photo and other identifying information on Kless's screen. It further indicated that the registered owner was female and about 5 feet, 7 inches tall and weighed approximately 180 to 200 pounds.

Upon receiving the data from the query, Kless drove ahead and "attempted to close the gap" between his patrol car and the Nissan. According to Kless, he was not able to identify who was driving the Nissan because "[i]t was dark out, and the vehicle was traveling away from [his] location."

After maneuvering around several cars on the road to get behind the Nissan, Kless activated his overhead emergency lights to effectuate a traffic stop. The Nissan pulled over without incident.

Kless then approached the Nissan's passenger side on foot. Once beside the car, Kless immediately observed two occupants through an already-open window. The driver, defendant Jamire Williams, spontaneously apologized to Kless, stating that he thought he could make it through the intersection before the traffic signal turned red.[3] Defendant Tyshon Kelly was seated in the front

---

[3] The State concedes that the only valid reason for the stop was the MDT random query return indicating that the Nissan's registered owner had a suspended license. Kless testified, and the footage from the mobile video recorder in his patrol car showed, that no red light had been run at the intersection.

passenger's seat. Both Williams and Kelly are males. The motion record reflects that Williams was 5 feet, 4 inches tall and weighed about 120 pounds.

Kless introduced himself and requested Williams's driver's license, car registration, and insurance card.[4] Williams produced his valid driver's license and the Nissan's registration documents, but he was unable to locate proof of insurance. Kelly called the vehicle's registered owner to tell her that he and Williams had been pulled over and to ask where she kept the documentation inside the car.

Defendants continued searching for the insurance card while on the phone, but to no avail. After some time, the owner offered to come to the roadside location to assist in the search. Kless admonished, however, that she could not drive there because her license was suspended.

At that point, Kless told Williams not to worry about finding the insurance card and that he "[didn't] really care if you can't find it." Kless advised defendants to "just hang tight for a second," and he walked back to his patrol vehicle. That initial phase of the traffic stop consumed nearly three minutes.

---

[4] It appears on the body-worn camera (bodycam) footage that both Williams and Kelly had been looking for documentation in the glove compartment before Kless reached the window.

About three minutes after that, while in his patrol car running a check on Williams's license, Kless answered a call from a fellow Deal police officer, Dan Lokerson, who was apparently in the area of the stop. Kless asked Lokerson, "Are you around or are you gone?" and "Do you want to roll over my way?"

Pertinent to a key issue before us, Kless then stated to Lokerson, as recorded on Kless's bodycam, "I can't tell whether I got smell or not, I just want a second opinion." Kless stated at the time (and later reiterated at the suppression hearing) that he had been sick that night and his congestion prevented him from clearly detecting the odor of marijuana.[5] Kless also contacted headquarters to request a criminal history and warrant check of Williams.

About two minutes after hanging up with Kless -- by this point eight minutes after the traffic stop began and five minutes after Kless had initially returned to his patrol car -- Lokerson arrived. He quickly consulted with Kless and approached the Nissan while Kless remained in his own patrol car.

Lokerson spoke with Williams and Kelly, examining an insurance card that defendants had managed to find in the Nissan. Because the card was

---

[5]  On the bodycam recording, Kless periodically can be heard sniffling, at one point remarking that he was "half clogged up."

expired, the car's insurance status remained unresolved. That interaction lasted for about two-and-one-half minutes.

Kless then got out of his police car and conferred with Lokerson. Lokerson told Kless that he had seen a spoon with white residue on it in the center console of the Nissan. Kless requested that Lokerson use the drug-sniffing dog already present in Lokerson's vehicle to conduct a sniff of the Nissan's exterior. Lokerson agreed even though he told Kless that he personally had not smelled anything except air fresheners.

At that point, Kless asked defendants to "pop out for a sec[ond]" from the Nissan, which they did. Williams asked Kless, "What happened, sir?" Kless replied that he had smelled marijuana emanating from the car "when [he] was out talking to [defendants] before." Kless told defendants that the dog would be doing a "quick sniff around the car." Williams responded that the officers would need consent from the vehicle's owner. Another officer who had reached the scene responded, "We don't need consent."

The officers directed defendants away from the Nissan and the dog, causing defendants to stand on the adjacent sidewalk. Kless then asked Kelly for his identification. Kless told defendants that he had stopped the car not only because it seemingly had run a red light, but also because the owner's license was suspended and Kless did not know who was driving.

The dog performed a sniff and indicated the presence of drugs in the vehicle. The officers then searched the car's interior, assisted by the dog.

After about five minutes, Lokerson told Kless he had found a small bag with "a little" marijuana under the passenger's seat. Lokerson also explained to Kless that he was not done searching the car. Kless responded that he would pat defendants down, and he proceeded to do so.

Throughout the car search and the subsequent pat down, Williams repeatedly protested to the officers about the search, including their lack of consent from the car owner. His words of protest were audible on the bodycam recording.

After the pat down, Kless placed defendants under arrest. Kless attempted to place them in handcuffs, prompting Williams to run. Kelly remained at the scene.

Several officers on the scene chased Williams, aided by the dog. The dog caught Williams in a nearby stream. The officers then secured Williams in handcuffs and brought him back to the roadside.

The officers asked Williams about what else was in the car and questioned why he would run just because they found "a bag of weed." Williams noticed that the officers were continuing to search the car and asked for an explanation. He reiterated that the search required consent and insisted

11

he be allowed to watch it. In response, Kless again told Williams that the car smelled like marijuana, that the canine indication allowed the officers to continue to search the car's interior, and that they already had found marijuana in the car.

Kless and another patrolman brought defendants back to the Deal police headquarters for processing. Lokerson remained at the scene. The continued search of the car revealed a handgun loaded with hollow-point bullets under the driver's seat.

Based on this evidence, Williams and Kelly were both charged with second-degree unlawful possession of a weapon (the handgun) and fourth-degree possession of a prohibited weapon or device (the hollow-point bullets). Williams was additionally charged with fourth-degree resisting arrest by flight.

B.

Before trial, Kelly moved to suppress the evidence found in the car; Williams joined in the motion. Defendants argued that Kless did not have reasonable suspicion to pull them over and that the evidence seized as a result of the vehicle stop must be suppressed.

The trial court held a one-day suppression hearing in August 2018, at which Kless and Lokerson testified. Defendants did not testify or present any

witnesses. During the hearing, the footage from the bodycams of Kless and Lokerson was played for the judge and marked into evidence.

Kless testified that he was first able to see who was actually in the vehicle "[o]nce [he] was at the window, on the passenger's side of the vehicle." Kless acknowledged that he was aware that the grounds for an MDT-based stop of the suspended owner no longer existed once he got to the side of the vehicle and could see the owner was not the driver, but that he proceeded anyway. Despite his uncertain comments at the scene, Kless told the court that he was able to detect the odor of marijuana while talking to defendants at the window and collecting their documentation.

Lokerson testified that he smelled no marijuana but that he "believed it's suspicious a lot of times when there [are] multiple air freshener[s], it is used to mask narcotic odor." Lokerson added that he had seen a spoon in the car but did not seize it "[b]ecause after [the officers] searched the vehicle and [he] was able to inspect it more closely, [he] was able to identify [a benign] substance, possibly of . . . a food substance." Lokerson recalled that when he flipped it over "there w[ere] no burn marks on the spoon" and it did not resemble what he had seen in the past of spoons associated with heroin use.

The motion judge concluded that case law, particularly Donis, did not support defendants' contention that an officer must confirm the driver's

13

identity before effectuating a stop of a vehicle when an MDT query indicates that the owner has a suspended license. The judge also found that Kless did not have the opportunity to verify the identities of the Nissan occupants before the stop. In addition, the judge ruled the officers were permitted to initiate a canine sniff under State v. Dunbar, 229 N.J. 521 (2017), because the dog sniff did not unduly prolong the stop. Further, the judge reasoned that the positive indication from the canine sniff created sufficient probable cause to search the car's interior. The judge accordingly denied the suppression motions.

Defendants were tried before a jury and a different judge over several days in March 2019. The jury found both defendants guilty of second-degree unlawful possession of the handgun, but not of fourth-degree possession of the hollow-point bullets. The jury also found Williams guilty of fourth-degree resisting arrest. Defendants moved for a new trial, which the court denied.

At sentencing, the State successfully moved for discretionary extended terms for both defendants. Williams was sentenced to a fifteen-year term for the weapons offense and a concurrent eighteen-month term for resisting arrest, while Kelly was sentenced to a fifteen-year term for his own weapons conviction. Both defendants received a seven-and-one-half-year parole disqualifier.

C.

Defendants appealed their convictions and sentences. They principally argued that the trial court erred in denying their motions to suppress the evidence obtained from the stop and search of the Nissan. They also raised several unrelated issues, only two of which are before us now. Specifically, both defendants asserted that the jury charge on gun possession was plainly erroneous. In addition, Williams individually claimed he was deprived of a fair trial because the jury was made aware of his protests to the search at the scene.

The Appellate Division, in a consolidated opinion, rejected defendants' arguments and affirmed their convictions and sentences. The appeals court ruled that the motion judge correctly found that New Jersey precedent allows officers to pull over drivers upon such random MDT license plate checks and "does not require officers to verify the driver's identity before effectuating" the stop. The appellate court additionally stated that, "[i]n any event, the motion judge found Kless lacked the opportunity to ascertain the owner's identity prior to stopping the Nissan in view of the circumstances presented." Consequently, the Appellate Division affirmed the validity of the motor vehicle stop, "substantially for the reasons stated by the motion judge." The appeals court declined to address defendants' contentions that the stop was

unconstitutionally prolonged, ruling that defendants had not preserved those contentions for appellate review.

The Appellate Division decided several other issues.[6]  Relevant here, defendants argued that the model jury instruction the court gave on the weapons possession counts misstated the burden of proof and contradicted the reasonable doubt standard by permitting an inference of possession when possession is "more probable than not."  The appellate court held that the instruction, which was not challenged by trial counsel, was not plain error because the jury was never "bound to find the inference or to view it favorably" and because the instructions, read as a whole, informed the jury of the proper burden of proof.

In addition, the Appellate Division concluded the statements Williams made at the scene about not consenting to the search were voluntary and not a violation of the Miranda[7] doctrine.  The appellate court held that the video footage should have been played without the audio.  However, the court further held that any error in admitting them was harmless because the prosecutor did not emphasize in summation Williams's invocation of any

---

[6]  Defendants both raised an evidentiary issue and an issue related to the State's obligation during discovery.  Defendants also challenged their respective sentences.  Those issues are not before us.

[7]  Miranda v. Arizona, 384 U.S. 436 (1966).

16

Fourth Amendment rights and focused more on Williams's flight from the scene of the traffic stop as indicative of a consciousness of guilt. The court added that, even if the audio track of the recording had been muted, the State would have been able to "advance exactly the same argument without any reference to Williams's invocation of his rights."

Defendants moved for reconsideration. Among other things, they asserted that the appeals court should have expressly addressed the merits of the prolongation issue. The Appellate Division denied the motion.

D.

Defendants petitioned this Court for certification, each arguing that the MDT-based stop was improper because Kless lacked reasonable suspicion that the Nissan driver was the car's owner whose license was suspended. They further argued the stop was unconstitutionally prolonged and not justified by Kless's admittedly uncertain detection of the smell of marijuana. Both petitions also contended that the jury charge on gun possession misstated the State's burden of proof and that the flaw comprised harmful error.

Williams included in his petition his contention that the video-recorded statement asserting his rights during the car search was unfairly prejudicial and should not have been admitted before the jury.

17

We granted certification on all these discrete issues, leaving undisturbed the rulings of the trial court and Appellate Division on other issues not covered by the petitions. See 252 N.J. 39 (2022); 252 N.J. 59 (2022). We also granted motions by the Attorney General, the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the American Civil Liberties Union of New Jersey (ACLU) to appear as amici curiae.

## II.

In their submissions to this Court, defendants assert that the stop of the Nissan was unconstitutional because Kless did not verify beforehand whether the car's driver looked like the photo of the license-suspended owner on the MDT display. Defendants argue that this Court should construe the Fourth Amendment and the New Jersey Constitution to require such a pre-stop visual confirmation. They rely on passages within the United States Supreme Court's opinions in Glover that distinguish between revoked and suspended licenses and require individualized articulations of reasonable suspicion. Along with the ACLU and ACDL, defendants catalog the many non-driving-related reasons for which a car owner could have a license suspended, in an effort to show the unreasonableness of a traffic stop on that basis alone.

Defendants further contend the Appellate Division erred in ruling they procedurally waived their related argument that the stop was unduly prolonged

18

after Kless visually confirmed that the registered owner was not driving, dispelling any reasonable suspicion for the stop. As to the merits of that argument, defendants assert that even if, for the sake of discussion, the initial stop was lawful, Kless had no right to remain standing next to the car once it became, as he admitted, immediately clear that the driver of the car did not look like the owner. They submit that when it becomes reasonably clear to an officer that the driver is not the owner, the officer must simply apologize briefly for the inconvenience and promptly allow the driver to leave.

Based on such proposed legal principles, defendants argue that the stop here should have ended once Kless arrived at the passenger window. They contend that the "plain smell" doctrine did not justify their continued detention because Kless told his fellow officer that he had a cold and was uncertain whether he had smelled marijuana, and the police therefore lacked reasonable suspicion of criminal activity. The ACDL and ACLU join in and amplify those arguments.

Conversely, the State maintains the Appellate Division correctly analyzed the stop and prolongation issues. As to the stop, the State argues that the United States Supreme Court's ruling in Glover does not require visual confirmation that the driver of the car is the owner whose license is either revoked or suspended before effectuating an MDT-based stop. In addition, the

19

State contends that <u>Donis</u> and its progeny in New Jersey have not required visual confirmation as a predicate to the stop, and that we should reject defendants' request here to prescribe a more burdensome rule of law.

Further, the State argues the stop was not unduly prolonged because even when Kless realized the men did not look like the Nissan's owner, he was authorized to remain by the car and complete the process of making the "ordinary inquiries" incident to a traffic stop, namely obtaining valid motor vehicle documents from the occupants. The State further contends that Kless's testimony sufficiently evidenced a "plain smell" of marijuana and provided reasonable suspicion to continue the stop and conduct a drug sniff and search of the car's interior.

The Attorney General joins in the State's position concerning the validity of the initial stop but takes no position on the "plain smell" and prolongation issues.

As for the other issues before us, both defendants repeat their argument that the jury charge on gun possession, despite it tracking the model charge, was flawed and comprised plain error. The State opposes that argument, endorsing the Appellate Division's analysis. None of the amici address the charge issue.

Lastly, Williams alone contends the Appellate Division erred in denying him relief because of the trial court's improper admission of evidence of his protests at the scene of the stop. The State contends no error occurred and that, in any event, as the Appellate Division found, any error would have been harmless. The amici do not address this issue, either.

## III.

## A.

We begin with an analysis of the search-and-seizure issues. Our discussion is guided by several fundamental and well-established principles of constitutional law.

## 1.

Under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, citizens have the right to be protected from unreasonable searches and seizures by law enforcement officials. A warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement. State v. Witt, 223 N.J. 409, 422 (2015).

In its landmark opinion concerning motor vehicle stops in Delaware v. Prouse, the United States Supreme Court observed that the reasonableness of a seizure is generally determined "by balancing its intrusion on the individual's

21

Fourth Amendment interests against its promotion of legitimate governmental interests."  440 U.S. 648, 654 (1979).  The Supreme Court recognized in Prouse that "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation."  Id. at 662.  The Court underscored that

> [a]utomobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities.  Many people spend more hours each day traveling in cars than walking on the streets.  Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel.
>
> [Ibid.]

Because of those motorist expectations, the Prouse Court reasoned that, "[w]ere the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed."  Id. at 662-63.

New Jersey case law has similarly recognized the importance of the liberty and privacy interests of the motoring public under our State Constitution.  See, e.g., Witt, 223 N.J. at 446-49 (adopting an "unforeseeability and spontaneity" predicate for reliance upon the automobile exception to the warrant requirement as striking the proper balance of reasonableness in light of

22

motorists' privacy and liberty interests); see also State v. Smart, ___ N.J. ___, ___ (2023) (slip op. at 3) (applying that test to invalidate a warrantless automobile search).

The appeal in Prouse specifically involved a defendant's Fourth Amendment challenge to a police officer's random, discretionary stop of his automobile. Prouse, 440 U.S. at 650-51. The officer had not observed any traffic or equipment violations, nor any suspicious activity. Id. at 650. He made the stop only to check the motorist's driver's license and the car's registration. Ibid. The officer was not acting pursuant to any police standards, guidelines, or procedures. Ibid. While walking towards the stopped car, the officer smelled marijuana smoke. Ibid. He spotted marijuana on the car floor, which he seized without a warrant. Ibid.

The Supreme Court invalidated the stop and the ensuing search in Prouse under the Fourth Amendment. Id. at 663. The Court held that such a detention of a motorist to check credentials is unreasonable, except in situations in which there is at least reasonable and articulable suspicion that (1) a motorist is unlicensed or the vehicle is unregistered, or (2) either the vehicle or its occupants are otherwise subject to seizure for violating the law. Ibid.

The Court recognized the State's legitimate interest in ensuring the safety of its roadways. Id. at 658-59. In particular, it validated the role of law

23

enforcement "in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." Id. at 658. "Unquestionably, these provisions, properly administered, are essential elements in a highway safety program." Ibid.

That said, the Court in Prouse weighed those state interests against "the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents." Id. at 657. As for the physical element, the Court noted the stop's interference with a motorist's freedom of movement, its inconvenience, and the consumption of time. Ibid. As for the psychological impact, the Court recognized that a police officer's command to pull over a vehicle to the side of the road can be "a possibly unsettling show of authority," one which "may create substantial anxiety." Ibid.

Upon weighing those competing interests and concerns, the Supreme Court adopted in Prouse a requirement of reasonable suspicion to justify a discretionary vehicular stop under the Fourth Amendment. Id. at 663.[8]

---

[8] As an important caveat not factually pertinent here, the Court clarified that states are not precluded from "developing methods for spot checks that involve less intrusion or that do not involve [an officer's] unconstrained exercise of discretion." Prouse, 440 U.S. at 663.

24

2.

The Supreme Court revisited those principles in 2020 when it took up the question in Kansas v. Glover of whether the Fourth Amendment allows a police officer to "initiat[e] an investigative traffic stop after running a vehicle's license plate and learning that the registered owner has a revoked driver's license." 140 S. Ct. at 1186. According to the stipulated facts in that case, a deputy sheriff ran a random computerized license plate check on a passing truck. Id. at 1187. The check revealed that the truck's registered owner, Glover, had a revoked Kansas driver's license. Ibid. The deputy had not observed the truck driver commit any traffic infractions. Ibid. Nor did the deputy attempt to identify the driver or ascertain whether he looked like the truck's owner before stopping the vehicle. Ibid. As it turned out, the driver was indeed the truck's owner, and he was charged with driving illegally with a revoked license. Ibid.

The Kansas Supreme Court held that the defendant-motorist's motion to suppress evidence seized from the truck was properly granted, as, under the Fourth Amendment, the officer "did not have reasonable suspicion" to stop the truck. Ibid. The state high court found that the deputy's "inference that Glover was behind the wheel amounted to 'only a hunch' that Glover was engaging in criminal activity." Ibid.

25

In a majority decision joined by eight Justices (two of them concurring), the United States Supreme Court reversed the Kansas court and upheld the stop of the truck. Ibid. The opinion of the Court pointed out that the deputy, after conducting a random query, "knew that the registered owner of the truck had a revoked license and that the model of the truck matched the observed vehicle." Id. at 1188. Based on that information, the deputy "drew the commonsense inference that Glover was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop." Ibid. (emphasis added).

Of particular relevance here, the majority in Glover observed that "[t]he fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [the officer's] inference." Ibid. That Glover's license had been revoked, the majority further noted, "d[id] not render [the officer's] inference unreasonable" because national empirical evidence supports the contention that "[d]rivers with revoked licenses frequently continue to drive." Ibid.

The Court found it significant that the Kansas "license-revocation scheme covers drivers who have already demonstrated a disregard for the law or are categorically unfit to drive." Id. at 1188-89. Given those features of Kansas' motor vehicle laws, "[t]he concerns motivating the State's various grounds for revocation lend further credence to the inference that a registered

26

owner with a revoked Kansas driver's license might be the one driving the vehicle." Id. at 1189.

The Glover majority concluded that "[u]nder the totality of the circumstances . . . , [the deputy] drew an entirely reasonable inference that Glover was driving while his license was revoked." Id. at 1191.  The majority, however, took care to "emphasize the narrow scope of [its] holding," noting that "the presence of additional facts might dispel reasonable suspicion." Ibid. "For example, if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Ibid. (emphases added) (quotation omitted).

Justice Kagan wrote a concurring opinion in Glover, which Justice Ginsburg joined.  Justice Kagan considered it "crucial" to the analysis in Glover that the officer knew "one more thing about the vehicle's registered owner, and it related to his proclivity for breaking driving laws." 140 S. Ct. at 1192 (Kagan, J., concurring).  Specifically, the officer learned from a state database that the truck owner's license had been revoked rather than suspended. Ibid.  Moreover, "Kansas almost never revokes a license except for serious or repeated driving offenses." Ibid.  Thus, "a person with a

27

revoked license has already shown a willingness to flout driving restrictions." Ibid.

Based on that reasoning, Justice Kagan explained she "would find this a different case if Kansas had barred Glover from driving on a ground that provided no similar evidence of his penchant for ignoring driving laws," such as "if Kansas had suspended rather than revoked Glover's license." Ibid. That analytic distinction between suspension and revocation was based on the fact that "Kansas suspends licenses for matters having nothing to do with road safety, such as failing to pay parking tickets, court fees, or child support." Ibid. In that respect, the Justice briefly cited New Jersey's statute related to suspending driver's licenses for failure to appear or pay for a parking violation. Ibid. (citing N.J.S.A. 39:4-139.10 (2019)).

Justice Kagan also noted that "several studies have found that most license suspensions do not relate to driving at all; what they most relate to is being poor." Ibid. In a situation in which a database query returned information that a vehicle owner's license was only suspended, Justice Kagan opined that "the good reason the Court gives for thinking that someone with a revoked license will keep driving -- that he has a history of disregarding driving rules -- would no longer apply. And without that, the case for assuming that an unlicensed driver is at the wheel is hardly self-evident." Ibid.

28

In the lone dissent in <u>Glover</u>, Justice Sotomayor expressed concern that "[t]he consequence of the majority's approach is to absolve officers from any responsibility to investigate the identity of a driver when feasible," which she noted "officers ought to do -- and are more than capable of doing." 140 S. Ct. at 1196 (Sotomayor, J., dissenting). Expanding upon a theme from the concurrence, Justice Sotomayor emphasized the differences between suspended and revoked licenses from one jurisdiction to another. <u>Id.</u> at 1198. She noted that "[w]hether the majority's 'common sense' assumptions apply outside of Kansas is thus open to challenge." <u>Ibid.</u>

Before today, this Court has not addressed <u>Glover</u>. In particular, we have not addressed whether the Supreme Court majority's analysis in that case -- specifically involving driver's license revocation laws in Kansas -- supports a comparable approach in New Jersey in a setting involving, as here, a car owner's suspended driver's license.

3.

Two decades before the 2020 decision in <u>Glover</u>, we considered in <u>State v. Donis</u> a related issue concerning the propriety of traffic officers using MDTs to perform computerized checks of the licenses and registrations associated with passing vehicles. We now turn to <u>Donis</u>, which has been a major focus of the briefs submitted to us.

29

In the consolidated appeals in <u>Donis</u>, this Court confronted the question of whether "suspicionless access" of information returned from an officer's random query on an MDT violated Article I, Paragraph 7 of the New Jersey Constitution. 157 N.J. at 48. In each of those two cases, police officers had "randomly entered the license plate numbers of petitioners' cars and accessed their [Division of Motor Vehicles] records, discovering that their driving privileges had been suspended." <u>Ibid.</u>

In petitioner Mario Donis's case, an officer "observed that the driver of the [car] was a male" who, "due to his low position in the driver's seat[,] was relatively short in stature." <u>Ibid.</u> Thereafter, the MDT query reported that the vehicle's registered owner was a male who was 5 feet, 8 inches tall. <u>Id.</u> at 48-49. Based on the officer's observations of the driver and the results of the MDT inquiry, he stopped the car. <u>Id.</u> at 49. During the stop, Donis confirmed to the officer that he was the vehicle's owner. <u>Ibid.</u> Donis was then cited for driving with a suspended license and for driving without liability insurance. <u>Ibid.</u>

In the companion case involving petitioner Heidi Gordon, a police officer conducted a random MDT query on Gordon's car while it was stopped at a red light, which showed "that the owner of the car was a . . . forty-eight year old woman whose driver's license had been suspended." <u>Id.</u> at 49-50.

30

"Because his headlights were shining into [the] car, [the officer] testified that he could determine that the driver and sole occupant of the car was [likewise] an 'older female.'" Id. at 50. Again, based on the officer's observations and the MDT results, he stopped the car. Ibid. The officer confirmed that the driver was also the registered owner, Gordon, whose information the query had returned. Ibid. He consequently issued her tickets for driving with a suspended license and driving without liability insurance. Ibid.

Both Donis and Gordon challenged the stops of their vehicles as unconstitutional under the New Jersey Constitution. Id. at 50-51. The Appellate Division upheld the stops, holding that they "did not constitute unreasonable seizures because the officers reasonably believed there was a 'general match' between the appearance of the drivers and the MDT's descriptions of [them]." Ibid.

This Court in Donis unanimously affirmed the judgments for the State in both cases.[9] The majority preliminarily noted the State's "vital and compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles and that motor vehicles are in a safe condition." Id. at

---

[9]  Justice Stein concurred in the result, affirming the convictions, but objected to part of the majority's rationale that law enforcement could randomly obtain access to and use "personal information" of motorists under N.J.S.A. 39:2-3.3 from an MDT without reasonable suspicion or at least some level of suspicion. Donis, 157 N.J. at 62-64 (Stein, J., concurring).

31

51 (quoting State v. Kadelak, 280 N.J. Super. 349, 360 (App. Div. 1995)). To that end, the majority observed, our statutes have authorized the collection of the data displayed on the MDT for the purpose of "assist[ing] law enforcement officers in locating the owners of stolen cars and to provide [law enforcement officers] with more complete motorist information." Id. at 52 (second alteration in original) (quoting Governor's Reconsideration and Recommendation Statement on Assembly Comm. Substitute for A. 1845 and A. 2448 (1989), reprinted in N.J.S.A. 39:3-4).

The petitioners in Donis argued that the police should be allowed to conduct MDT queries only when they observe a driver commit a traffic law infraction. Id. at 54. This Court disagreed with that proposed restrictive approach, holding that it "would render MDTs useless as efficient investigative tools." Id. at 56. In that regard, the majority observed that "spot check[s] of a license and registration status contribute[] to public safety." Ibid.

The majority stated in Donis that "[i]f the . . . MDT informed the officer that the car's owner had an expired or revoked license, the officer would have adequate grounds to stop that vehicle." Id. at 56-57. However, later in the opinion, the majority elaborated further:

> [I]n both of these appeals, petitioners' convictions were
> based on license plate identification, and that additional

32

evidence linked each petitioner to the offense. The police officers in their initial use of MDT learned that the vehicles' owners had suspended licenses. That information itself gave rise to the reasonable suspicion that the vehicle was driven in violation of the motor vehicle laws and was in itself sufficient to justify a stop. However, in addition to that information, the officers also had determined through a "match-up" that the drivers were the registered owners. On the descriptive information provided by the MDT and the "general match" of petitioners, the officers therefore had reasonable suspicion to believe that the drivers were violating the law.

[Id. at 58 (emphases added).]

The parties and amici in the present appeals disagree over the precedential import of the above-quoted passage from Donis. Defendants, the ACDL, and the ACLU maintain that the "match up" language is part of the holding of the case. The State and the Attorney General, on the other hand, contend that the "match up" language is mere dicta and instead rely upon the Court's statement that the MDT license suspension output was "in itself sufficient to justify a stop."

We need not settle that debate about Donis here. Instead, we choose to analyze the legal questions before us on their own merits, informed by the intervening guidance of the United States Supreme Court in Glover, which was issued two years after the trial court proceedings in this case.

33

B.

1.

Unlike the Kansas motor vehicle laws at issue in Glover, New Jersey's regulatory scheme has not markedly distinguished between the severity of offenses that can produce driver's license suspensions as opposed to revocations. Although they were amended a few years ago, see L. 2019, c. 276, our motor vehicle statutes have traditionally authorized courts to impose the sanctions of suspension and revocation somewhat interchangeably.[10]

In New Jersey, the authority to suspend or, alternatively, revoke a driver's license generally derives from a common statutory source, N.J.S.A. 39:5-30(a). That provision states, in pertinent part, that "every privilege to drive motor vehicles . . . may be suspended or revoked . . . for a violation of any of the provisions of this Title or on any other reasonable grounds." Ibid. (emphasis added).

The statute permits license suspension or revocation for a variety of serious driving-related offenses, including those that cause death or serious

_____

[10] The 2019 amendments were entitled "Driver's Licenses -- Suspension or Revocation." See L. 2019, c. 276. The amendments require more individualized consideration of an offender's circumstances before a license can be suspended or revoked, at various points adding that the court or MVC should consider "the circumstances of the offense [or violation], whether the suspension of the person's driver's license will result in extreme hardship and alternative means of transportation are not readily available." Ibid.

34

injury. Subsection (b) authorizes the director of the MVC to "issue a notice of proposed final suspension or revocation of any license certificate" for certain driving violations which have "resulted in the death of another." N.J.S.A. 39:5-30(b) (emphasis added). Moreover, subsection (e) permits the MVC director to "immediately issue a preliminary suspension of any license certificate" upon notice of certain violations resulting in the death or serious bodily injury of another. N.J.S.A. 39:5-30(e) (emphasis added). Our statutes also permit courts to forfeit or suspend, rather than revoke, the licenses of motorists who have committed certain drunk driving (DWI) offenses. See N.J.S.A. 39:4-50; see also, e.g., N.J.S.A. 39:4-50.17(a)(2) (referring interchangeably to a "period of license forfeiture" and a "period of license suspension" in providing for the ignition interlock device as an additional penalty).

Like Kansas, New Jersey authorizes license suspensions to be imposed for a variety of offenses and conduct that do not involve driver safety infractions. See, e.g., N.J.S.A. 2A:17-56.41(a) (authorizing the suspension of a driver's license of a person who had failed to pay court-ordered child support); N.J.S.A. 2C:46-2 (authorizing the suspension of a driver's license of a person who had defaulted on court payments); N.J.S.A. 39:4-139.10 (authorizing the suspension of driving privileges for failure to pay outstanding

35

parking fines or appear for a parking-related municipal court summons).[11]  On

the other end of the spectrum, New Jersey drivers may also have their licenses

suspended -- rather than revoked -- for driving infractions causing death or

bodily injury, and other serious categories of driving-related offenses such as

DWI.

As the above discussion shows, the sharp line in Kansas between

revocation-eligible offenses and suspension-eligible offenses is blurred in our

state.  We therefore decline to rest our constitutional analysis on that basis.

---

[11]  Supplemental data supplied to us by the Attorney General at our request
after oral argument shows that, as of 2010, over one million New Jersey
drivers had their licenses suspended.  Yusuf Mehta, et al., Restricted-Use
Licenses for Suspended NJ Drivers 19 (2014), https://www.nj.gov/
transportation/business/research/reports/FHWA-NJ-2015-006.pdf.  We are
mindful the Legislature amended the statutory scheme in 2019, effective as of
January 2021, to reduce the categories of offenses and conduct that can
produce license suspensions.  See L. 2019, c. 276.  We are also mindful the
Judiciary, by a series of administrative orders between 2019 and 2022, purged
over a million older license suspensions and minor municipal court
dispositions that were needlessly still on the books.  See Sup. Ct. of N.J.,
Dismissal of Approximately 266,000 Municipal Cases More Than 24 Years
Old; Recission of Driver's License Suspensions and Recall of Arrest Warrants
(Dec. 12, 2022 Order); Sup. Ct. of N.J., Dismissal of Nearly 300,000
Municipal Cases More than Twenty-Seven Years Old and Recall of Driver's
License Suspensions (May 21, 2021 Order); Sup. Ct. of N.J., Dismissal of
Certain Municipal Court Cases More than Fifteen (15) Years Old (Jan. 17,
2019 Order) (addressing 787,764 unresolved complaints on minor municipal
court matters from before 2003); Sup. Ct. of N.J., Dismissal of Certain Minor
Municipal Court Matters Older Than 2003 -- Supplemental Order for Bergen
County Matters (Sept. 24, 2019 Order) (addressing 16,777 unresolved minor
municipal matters in Bergen County).

Subject to constitutional limitations we will delineate herein, a police officer in New Jersey has an equivalent legal basis to stop a vehicle for a suspension-based reason as a revocation-based reason.

2.

A more significant empirical question implicated by Glover is how frequently a vehicle owner who has a suspended or revoked license happens to be the person driving that vehicle. The partial data supplied to us by the Attorney General compiling stops over a ten-year period by State Police officers (which does not include stops by county or local police) reflects that the stopped motorist was issued a ticket for driving with a suspended license or suspended registration about 72 percent of the time.[12] Although that percentage includes an unquantified number of registration violations and is not recent, it corroborates to some extent what the Supreme Court majority in Glover described as the "commonsense" nature of an inference that the vehicle

---

[12] The data include stops made by State Police of all motorists, not just stops based on MDT "hits." The data aggregates stops for suspected violations of N.J.S.A. 39:4-30, which covers both violations for driving with suspended or revoked licenses and suspended or revoked vehicle registrations, with no way to distinguish between the offenses for which a summons was issued. We refer to these figures only as a rough estimation of the frequency with which an MDT-based stop might lead to a summons issued to the registered owner who was driving the vehicle. We also recognize that, inversely, the partial statistics suggest that nearly 30 percent of the motorists stopped by State Police for a suspected N.J.S.A. 39:4-30 violation are seized without being issued a summons.

owner, despite having lost the privilege to drive, can be reasonably suspected to be the person behind the wheel. Glover, 140 S. Ct. at 1188.

In addition, we note that our eluding statute, N.J.S.A. 2C:29-2(b), codifies a rebuttable presumption that "the owner of a vehicle or vessel [observed to be eluding the police] was the operator of the vehicle or vessel at the time of the offense." That statutory presumption offers further support for the "commonsense" inference that the person who owns a vehicle is likely, albeit not certain, to be the person driving it.

We are mindful that, as Justice Kagan's concurrence in Glover observed, sometimes a household with multiple drivers may share the same vehicle (such as "a family minivan") owned by only one family member. 140 S. Ct. at 1193 (Kagan, J., concurring). Those sharing arrangements can be more common in less affluent households that cannot afford multiple vehicles. Even so, we have been supplied with no data that refutes the "commonsense" inference of ownership endorsed by the Glover majority.

The constitutional requirement of "reasonable and articulable" suspicion to stop a vehicle, articulated decades ago by the Supreme Court in Prouse, remains the Fourth Amendment standard. As Prouse and its progeny forbid, an officer may not stop a car on a mere hunch that the driver may lack proper credentials. The information generated by an MDT query reflecting that the

38

owner has a suspended or revoked license presumptively supplies such reasonable suspicion in the absence of information that negates that inference.

We therefore follow the Glover majority's guidance and hold that, in the absence of information that reasonably indicates to a pursuing officer that the driver is not the vehicle's owner, the MDT data furnishes reasonable suspicion to authorize the stop. Neither the parties nor amici have cited to us an opinion from another state's highest court that has rejected such a construction of Glover, or declined to follow that opinion under their own state constitutions.

That said, there is a crucial limitation to that principle, one on which nearly all counsel before us agree. The limitation is that once it becomes reasonably apparent to the officer that the observed driver does not resemble the owner -- either by the photo displayed on the MDT or the age, gender, or description of the owner reported on the license or other visible characteristics -- the pursuit or stop of that driver must cease. This obligation to cease the process is illustrated by the hypothetical scenario posited in the Glover majority opinion involving an officer who "knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties." 140 S. Ct. at 1191.

Furthermore, an officer making an MDT-based stop who is presented with sufficient objective reason to believe the driver is not the owner may not,

39

without further additional constitutional justification, linger by the vehicle and continue the roadside detention, even to collect or review the driver's documentation. As the Attorney General, defendants, the ACDL, and the ACLU all agree, the stop must end. The officer in that situation may only attempt to briefly explain the vehicle was inadvertently stopped, and tell the driver that the driver is free to proceed. Such a very brief conversation might helpfully dispel possible confusion by the motorist. Indeed, none of the parties advocate that the officer should say nothing and simply drive away and leave motorists wondering what had occurred and whether they are free to leave.

We reject the State's argument, which is not supported by the Attorney General, that an officer who realizes the driver is not the owner nonetheless can prolong the stop to delve into whether the driver has proper credentials. As the Supreme Court has noted, the Fourth Amendment does not allow motor vehicle stops to be unduly prolonged. Rodriguez v. United States, 575 U.S. 348, 350-51 (2015) (holding that a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop (alterations in original) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005))). New Jersey case law adheres to that principle. See Dunbar, 229 N.J. at 540; see also State v. Nelson, 237 N.J. 540, 552-54 (2019) (applying Dunbar and holding that the prolongment of a stop was constitutional only

40

because facts apparent to the officer gave rise to reasonable and articulable suspicion of criminal activity). There is no constitutional justification for the continued detention that has been advocated here by the State.[13]

If, however, during the brief time in which the officer is lawfully at the side of the car providing the motorist with an explanation and permission to leave, that officer observes in plain view a firearm, illegal narcotics, or other apparent contraband within the vehicle, the officer may pursue a further investigation. In that situation, the officer may detain the motorist for an additional reasonable period of time based on reasonable suspicion that another, separate crime is being or has been committed. Such further investigation may include a canine drug sniff, provided the sniff does not consume an unreasonable period of time. See Dunbar, 229 N.J. at 540.

In announcing these principles, we are cognizant that it can be impractical or hazardous for an officer to determine whether a driver clearly does not resemble the photo or description of the vehicle owner. The stop may occur at night in a poorly lit area, or the age, gender, height, or weight of the driver may not be readily ascertainable. These are all practical impediments

---

[13] The State's reliance on cases such as State v. Dickey, 152 N.J. 468 (1998), and Dunbar for the proposition that law enforcement may make the ordinary inquiries incidental to a lawful traffic stop is misplaced. Once reasonable suspicion has dissipated, the continued seizure is no longer lawful, so that line of cases does not apply.

41

affecting the totality of circumstances, and the reasonableness of an officer's continued inference that the stopped motorist is indeed the vehicle owner. But, as the Supreme Court posited with its older-male and younger-female hypothetical in Glover, there will be other situations in which the mismatch is patently and immediately obvious. In such instances of obvious mismatch, the constitutional grounds to continue the stop evaporate.

Lastly, although we decline the invitation of defendants and the ACDL and ACLU to adopt a rule of law that requires visual confirmation before a vehicle is stopped, we encourage law enforcement officials to make reasonable efforts to attempt such verification if -- and only if -- it is feasible and safe to do so.[14] We express that encouragement mindful of what can be an alarming and intimidating experience for an innocent motorist when pulled over by the police, particularly persons of color. The Supreme Court recognized that

---

[14] Indeed, the two cases in Donis illustrated that at times such visual confirmation is feasible, as the police managed to confirm a visual match before stopping both motorists. 157 N.J. at 48-50. We do not, of course, condone dangerous driving maneuvers by police officers to obtain a glimpse of a passing motorist, particularly on dark, hilly, or curving roads. Our point is that if obtaining a visual confirmation is reasonably safe and practicable, the officer can avoid wasting time and creating unnecessary inconvenience for both the officer and the motorist. See also Donis, 157 N.J. at 64 (Stein, J., concurring) (cautioning against "an unproductive application of police resources" in utilizing MDT data, albeit in the context of random, suspicionless stops).

realistic potential for psychological trauma long ago in <u>Prouse</u>, and it remains a concern to this day.

The frequency with which innocent drivers can be stopped has dramatically increased with newer technology that has surpassed the one-at-a-time MDT queries involved in <u>Donis</u> in 1998 -- ALPRs now enable 1,800 or more licenses to be checked simultaneously within a minute. <u>ALPR Operational Guide</u> at 9. Given that rapid change in technology, the data provided to us by the Attorney General showing that nearly 30 percent of drivers stopped by the State Police for suspected license or registration violations are not issued summonses -- which suggests that in numerous suspected suspended-license cases the drivers may not be the vehicles' owners -- is worrisome. Nonetheless, as a matter of federal and state constitutional law, we do not mandate visual confirmation. Instead, we leave it to policymakers to consider whether other measures can be taken without sacrificing public safety that could reduce the number of MDT-based stops of innocent motorists.[15]

---

[15] <u>See, e.g.</u>, N.J.S.A. 2C:35-10c(a) (the Legislature's declaration in the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act that the smell of marijuana alone can no longer be a sufficient basis to search a vehicle without a warrant).

## C.

We now apply the above principles to the present case. To begin with, we agree with the trial court and the Appellate Division that Officer Kless had a sufficient reasonable and articulable suspicion to stop the Nissan in the circumstances presented. The MDT display, which was not controverted, reported that the registered owner of the Nissan had a suspended license. The trial court accepted as credible Kless's account that it was too dark to see if the motorist, who was already driving away, looked like the registered owner.

We defer to the motion judge's finding that Kless was unable to determine who was driving and thus had no reason to believe the driver was not the Nissan owner until the point when Kless walked up to the car's passenger side and saw the two occupants from a close distance. See Smart, ___ N.J. at ___ (slip op. at 10) (requiring deference to a trial court's factual findings from a suppression hearing if based on "sufficient credible evidence in the record" (quoting Dunbar, 229 N.J. at 538)). By that point, it was apparent to Kless that Williams, a 120-pound male, was not the 180- to 200-pound female who was the car's registered owner.

We then consider the next step in the sequence of events, when Kless arrived at the passenger side of the car next to the open window.[16]  According to Kless's own statement to his fellow officer, Kless said "I can't tell whether I got smell [of marijuana] or not," stating that he was unsure because of his stuffy nose and wanted a second opinion.  The trial court's decision did not quote or discuss that important equivocation.  The record is unclear about the precise point in time when Kless first believed that he might have smelled marijuana while at the car window.  His confidence in his perception increased in retrospect after the bag of marijuana was discovered and then later at the suppression hearing.

We agree with defendants that Kless's uncertain perception of marijuana odor he initially conveyed to his fellow officer at the scene fails to rise to the level of reasonable and articulable suspicion of criminality to have authorized their continued detention at the roadside, once the officer objectively determined the driver was not the owner.  "Under the plain-view doctrine, the constitutional limiting principle is that the officer must lawfully be in the area

---

[16]  We are unpersuaded that defendants in the trial court waived their ability to argue on appeal that the stop was unduly prolonged.  They moved to suppress all of the incriminating evidence derived from the stop and search of the Nissan, and their motion reasonably encompassed all steps that led to that seizure even though their main focus was on the validity of the initial stop.

where he observed and seized the incriminating item or contraband, and it must be immediately apparent that the seized item is evidence of a crime." State v. Gonzales, 227 N.J. 77, 101 (2016) (emphasis added).[17]  Although the plain-view doctrine typically is raised in the context of probable cause to conduct a search, rather than reasonable suspicion to make a stop, neither level of suspicion authorizes police intervention that is based on a mere hunch.

Kless's ability to smell was admittedly impaired by his cold. Reasonable suspicion, although it does not require certainty or probability, cannot be founded upon what an officer with a stuffy nose tells his colleague he literally "can't tell."  The smell of marijuana under these circumstances was not "plain" to Kless as he described it to Lokerson.  His conduct in requesting another opinion demonstrated his uncertainty.  Meanwhile Lokerson, who apparently had no stuffy nose, told Kless that he did not detect any odor.  The facts here are simply too weak to support a plain-smell justification to prolong this mistaken stop and proceed with a search of the car once it was apparent that the owner was not the driver.

Although the drug-sniffing dog arrived with Lokerson only a few minutes later and the search was performed quickly, defendants should have

---

[17]  The "plain smell" doctrine is an analogue to the "plain view" exception. State v. Judge, 275 N.J. Super. 194, 200 (App. Div. 1994).

been already permitted to leave at that point. Kless did not observe any contraband inside the car while he was standing next to it. Nor did he report that Williams appeared to be impaired by drugs or alcohol. And, as the video later showed, Williams had not run a red light or violated traffic laws. Therefore, immediately upon observing the occupants of the vehicle, Kless should have done no more than explain the vehicle had been inadvertently stopped and told defendants they were free to leave.

In sum, we conclude as a matter of law that the police lacked a "reasonable and articulable suspicion" to prolong the stop. Dunbar, 229 N.J. at 540. The fruits of the ensuing car search were therefore unconstitutionally obtained and must be suppressed.

We accordingly reverse the suppression rulings of the Appellate Division and the trial court because of the stop's unjustified prolongation. Because the judgments of conviction for gun possession were based on evidence of a seized weapon that should have been excluded at trial, we vacate defendants' convictions of those charges and remand for further proceedings.

IV.

Although it is not necessary for us to do so in light of our reversal of the suppression rulings, we very briefly comment on the remaining two points raised in the petitions.

47

A.

Defendants both contend the trial court committed harmful error by issuing the model jury charge on gun possession, even though their trial counsel did not object to the charge. Specifically, defendants criticize the portion of the model charge that allows the jury to make a permissive inference that a defendant possesses a firearm when the circumstantial evidence makes it "more probable than not" that the inference is true. Model Jury Charges (Criminal), "Possession of Firearms, Weapons, Destructive Devices, Silencers or Explosives in a Vehicle (N.J.S.A. 2C:39-2)" (approved Mar. 30, 1993). Defendants contend that the probability-based language improperly shifts or dilutes the State's burden to prove the element of possession beyond a reasonable doubt.

We discern no plain error stemming from the use of the model charge in this case. The model charge has been in existence for decades and was derived from previous case law. See State v. Humphreys, 54 N.J. 406, 415-16 (1969) (holding that a jury instruction stating that the presence of a firearm could give rise to a presumption -- rather than an inference -- of firearm possession undermined the State's constitutional burden of proof); State v. Bolton, 230 N.J. Super. 476, 480 (App. Div. 1989) ("[T]he jury may be advised that it can

48

draw an inference [of possession] if it finds it more probable than not that the inference is true.").

The judge here read the relevant portion of the model charge essentially verbatim. See State v. Ramirez, 246 N.J. 61, 70 (2021) (discerning no plain error when the trial judge's instruction tracked a model charge verbatim and no objection was made). The judge made clear that the inference of possession was not mandatory, instructed the jury on specific relevant facts that it could consider such as the proximity of Williams and Kelly to the firearm within the car, and repeatedly advised the jurors of the State's overall obligation to prove each element of the charged offenses beyond a reasonable doubt.

Nonetheless, given defendants' assertion that the model charge's reference to probability might confuse jurors, we refer this subject to the Model Criminal Jury Charges Committee and ask that the phrase "more probable than not" be removed to avoid possible confusion.[18] A revised model charge should also underscore that the State ultimately must prove a defendant's possession beyond a reasonable doubt. See N.J.R.E. 303(c).

---

[18] We note that the model jury charge on circumstantial evidence includes a definition for an inference that avoids using the "more probable than not" language from Bolton, 230 N.J. Super. at 480. See Model Jury Charges (Criminal), "Circumstantial Evidence" (rev'd Jan. 11, 1993) ("An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence."). Going forward, similar language is warranted for the weapons possession charge.

B.

For sake of completeness, we finally address Williams's individual argument that he was unfairly prejudiced by evidence shown to the jury of his conduct at the scene when he questioned the police's right to conduct a canine sniff and search of the car without the owner's permission. The Appellate Division correctly held that the video footage should have been played without the audio. However, we also concur with the Appellate Division that the erroneous admission of that evidence was harmless in light of the proofs as a whole and the context of the trial. The presentation of the evidence did not sacrifice Williams's constitutional rights. Indeed, it is unclear that a jury would necessarily regard Williams in a negative light for voicing to the officers the property interests of the absent car owner.

V.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUDGE SABATINO's opinion.